Good morning. May it please the court. My name is Robin Conrad, and with me today is my co-counsel Estella Demas. We represent the petitioner-appellant in this case, Graham Henry. Before I start my argument, I would like to save five minutes for rebuttal. You may just watch the clock when you're... This case has come before this court today because Mr. Henry's constitutional rights were violated during his trial. Before I begin my legal argument, I would ask the Court's indulgence while I provide a brief overview of the two accounts presented at trial regarding what happened at the crime scene. You can be brief. We've read the briefs. We've read all your stuff, and we understand the conflict between the footprint testimony. Okay. So just so the Court's aware, Mr. Henry has repeatedly stated he made certain footprints at the crime scene, and the State's crux of their argument was that Mr. Henry was lying as to that. Ms. Conrad, I know you've got a flow of your argument here, and you can take this up whenever you want, but at some point I'd like to hear your thoughts about the procedural bar on challenging the testimony with regard to the footprints because of the fact that he's been saying since the trial that the photographs and so on were altered, and we've got a finding by both the State trial court and on PCR review and the Federal District Court that there's a lack of due diligence on Mr. Henry's part in not raising these claims until now. In the claims related to his Brady-Nippoo claim, there is Supreme Court precedent in Banks v. Dretke saying that a Petitioner cannot be faulted for evidence that the State has withheld. And information in this case, Mr. Henry now has evidence that the State presented false testimony in order to get a conviction against Mr. Henry. Kennedy, why don't you break this up? They all sort of related. Go ahead. They are related, but break them down, because the district court only addressed the photos on the procedural bar. You have the Brady claim with regard to the notes and the drawing that's attached. Correct. That did not, Mr. Henry was not aware of that, as I understand, until, that they even existed until the Federal proceedings. Is that correct? That is correct. Okay. That's on the photos. The photos, as I understand it, he was contesting the accuracy of the photos all along and argued that they were being manipulated. Correct.  So you had the photo. Henry had the photos. His counsel had the photos. As I understand, the new evidence is a new expert has come along and analyzed them. Is that correct? In part, yes. Okay. And so he had all that information, but he's gotten around to getting a photo expert to come along and now impeach them. And then the third thing, the Napoo claim, is the Patterson testimony. And the Patterson testimony, he testified at trial. He was corroborated at the time by another witness, a tracker. I understand the tracker may have somewhat softened his position in light of the new photo analysis. But, again, there's no new evidence on that claim that's a Napoo claim, and you're arguing that Patterson lied. But that information was before in the possession of Mr. Henry and his counsel for quite a long time. So when you address the procedural default, try to avoid, if you can, lumping them all together, because there may be different circumstances with respect to where the evidence is coming from. Okay. And that's a good point, Your Honor. And it's sometimes difficult to not lump them together because they are so interrelated here. The photographs and the evidence now to support the fact that Mr. Henry can now show through expert testimony that there the State has withheld photographs, that there are problems with the photographs, that all relates to the testimony of Detective Patterson on the day that he went to the crime scene with Mr. Henry. But, Ms. Conrad, I'm still struggling with the lack of due diligence finding. This was a hotly contested issue. It was basically the central issue in the case at trial, and Detective Patterson and Bernal Lawrence, the tracker, were extensively cross-examined. The defense introduced a hundred exhibits, many of them either its own photos or the State's photos, in order to try to impeach the testimony of Detective Patterson and Tracker Lawrence. And yet, Mr. Henry waited literally years before pursuing the claims that he now wants to bring. And both Judge Kahn and Judge Bolton found that there was no due diligence here in pursuing those claims. Well, I would just like to point out this claim, this Brady-Napoo claim, has not been in front of the State courts. No, I understand. You're claiming that the footnotes and this drawing are exculpatory. We've got a finding by the Federal District Court on habeas that it's mixed, both inculpatory and exculpatory, but it is more inculpatory than exculpatory. So I'm not sure you're even going to be able to convince me that there is a Brady violation here, because I've got a finding by the District Court that this evidence is not material as it would relate to the impeachment of Patterson and, I guess, Lawrence. And I'm finding a difficult time agreeing with you that there was even a Brady violation. I'm having trouble on that as well, finding that it was even suppressed from the standpoint, if looking back on this, they both foot and Henry were basically arrested at the same time. And it says they were tried differently. But it would have been obvious to anyone at that time that they were telling different stories about who did what. And so that was, that's what you knew as Henry's counsel, what you were facing. And I think would have had access to everything that Foote said as part of it. Now, how exactly they got separated, you know, I'm trying to look back. There were obviously probably, I don't know whether you asked to sever or whether the prosecution severed on their own because of aranda issues. But it was clear that you had these two accounts of what happened all along. And in order to prepare for it, I suppose you couldn't have known because Foote ultimately pled guilty, right? Yes, after a hung jury. Okay. So he had a trial, then a hung jury. So he wouldn't have been available to call as a witness. You know, the prosecutor couldn't have called him. They didn't make a deal in that sense. So, but obviously that was all part of the initial investigation, which would have been something that you would have had access to. You would have, there were trial, everything. So it was all crucial. So I'm not sure how it was really suppressed even. Well, Your Honor, the Foote's diagram was suppressed because it was never turned over to Mr. Henry's counsel. This diagram shows, it's consistent with what Mr. Henry has said, that he hopped up the back of the berm and did not help drag the victim out of the front of the truck. I mean, the diagram demonstrates that. But it also shows, but Foote's also showing how Henry killed the victim in that diagram, right?  So, but I don't think it's, I don't think it's the same thing. I mean, it's not the same thing. I would disagree. Well, but that's what, there was a finding in terms of that it was more exculpatory really than, more inculpatory than exculpatory. And obviously we disagree with that finding by the district court, that this of course But are we free to disregard it and through the habeas lens? Yes, this Court should review the issue de novo. So how do you get that diagram into evidence? Well, if you recall, Your Honor, what we had argued below and argued in our briefs is that it could have been used under Rule 804 of evidence to corroborate the other statement that Mr. Henry tried to get into evidence, which was in We've got a finding by Judge Kahn that under Arizona evidence rules it's not admissible and for the reasons Judge Callahan just articulated it, you don't have Foote there to authenticate and explain it. So I don't understand how it comes in under Foote was an unavailable witness because he did not testify and he took, he exercises his rights to not testify. Mr. Henry wanted to admit notes from an interview that Foote gave that said that he was the one who dragged the victim up the berm. And Judge Kahn wouldn't let that in. On direct appeal, on review of that issue, the Court said, no, this can't come in. The district or the trial court, I'm sorry, erred or did not err because there was no independent corroborating evidence. In order to have this statement come in of an unavailable witness, there has to be independent corroborating witness. It has to be reliable, basically. Right. Yeah. And Judge Kahn said it wasn't. On that particular statement, but Judge Kahn never reviewed this new evidence that has come up in Federal habeas. This claim has not been before Judge Kahn. This Brady-Napoo claim has only been presented in the State court. Wait a minute. You're lumping them. What? Are we talking about the drawing now? Correct. Okay. And you say he never saw that. No. The State court has never seen this drawing. Okay. But we still have to find that it's material in order to fall within the purview of Brady-Napoo. Right. Okay. So I'm looking at the drawing, and you say that it's consistent with what Mr. Henry said, but it isn't because he said he jumped out of the back of the truck, right? Correct. Okay. And the drawing shows clearly that he got out of the driver's seat, right? It could be. It looks like that may be the case. It looks like it. It doesn't even come close because otherwise the line wouldn't start on the left-hand side of the car. It would start at the back, and it doesn't. What this drawing does do, however, is discount entirely the State's theory of the case. Well, if that's all there was, was the drawing. But there's the whole notes to which it's attached, and all of that talks about how Henry was the acting party, not Mr. Foote. Right. I mean, the notes are also inculpatory in the sense that they have information against Mr. Henry. However, there is other information in the notes that support Mr. Henry's story. Well, there's a finding, as Judge Tallman said. It's both inculpatory and exculpatory in some respects. But it doesn't exonerate Mr. Henry. It impeaches a key part of his testimony, which is he was a passive observer in the back of the truck, and he had nothing to do with it except he was trying to go up and help Mr. Estes after Mr. Foote had acted. And Foote's narrative discounts that. And the drawing shows that Henry got out of the driver's seat. If I'm a juror, I'm not going to be kind of wondering, okay, what are you putting this in for? Well, this information would also have impeached the testimony of the State's witnesses saying that Henry and his co-defendant dragged the victim up the berm together, dragging them together to the place where Mr. Estes was killed. This does not show that at all. So what we have here is additional new evidence that would impeach the State's witness. And I understand that this is a complicated issue, and it's factually a bit confusing because we have these new evidence that is in part Foote's drawing that the State never turned over, and then in part this photo, the information about the photos. The problem, though, is that this drawing is not self-authenticating. For the very reasons that Judge Fischer just articulated, you can't look at this are not terribly helpful to Mr. Henry. So I'm still scratching my head trying to figure out how you get this drawing in, even if it's offered for purposes of impeachment. If it were presented at trial, it could Mr. Henry's counsel had been given it at trial, he could have had the opportunity to find out where this came from, you know, ask the person who had gotten the document. But how would you get it? You're talking to, like, trial lawyers here. And how would you get this in? Even if you could get in that little tiny piece, how would you get that in without opening, you know, the door to get in everything that's really bad for your client? You don't get to just cherry pick and say, you know, it's sort of, you know, like, you don't get to just say my client's a nice guy and then escape the fact that he's got robbery and murder convictions or something. Here, you don't get to get in your gloss on one little tiny thing and then keep the other out. And I'm still not seeing how you get even the little piece in. Well, Judge Callahan, I understand that. You can't just pick and choose. I mean, that's how the court – The whole can comes in. But that's what the whole point of this case is, is that we have a one-sided story that was presented to the jury because of this new information that's now come in. Maybe this ultimately wouldn't have made a difference, but that's not the test that this court should look at. It's whether it undermines confidence in the verdict. And this information cumulatively undermines confidence in the verdict. Well, you're offering it for impeachment on an area that was thoroughly cross-examined on in an attempt to impeach the State's case. So in that regard, to the extent that it is exculpatory – and I have grave doubts as to the weighing of inculpatory versus exculpatory – but even if I grant you that there's a little bit of exculpatory evidence in here, it's cumulative of the impeachment that was already attempted ad nauseum by the defense at trial. So how can we say under Brecht v. Abramson that we don't have confidence in the verdict here? You haven't addressed the factors that both State and Federal judges looked at, which included there was only blood on Henry's clothes. Henry lied to the officers when he was first arrested. There were – oh, the testimony of the landlady, the fact that Foote was virtually comatose and lying on the ground when stopped by the DPS officer shortly after the crime, which would render it questionable whether he even had the physical capacity to stab Estes. And all of that is – doesn't go to making this particular piece of evidence very reliable. I agree with you that there was some information limited against Mr. Henry. Now, just so we are clear about the blood that was on his clothes, this wasn't a lot of blood. The only thing was a transfer smear on his cuff that was consistent with his story of trying to assist Mr. Estes after he had been stabbed. Or consistent with the State's theory that he was the one who wielded the knife. I mean, the victim was stabbed through the heart, was he not? And his throat was slit? And wasn't it on the arm of the stabbing? He was stabbed in the neck and then in the stomach. But the blood's on the arm and the stabbing was with the hand, right? There was a little bit of blood on either of the cuffs. Right. And the cuffs are connected to the hand and the hand does the stabbing. And what about Mr. Foote? What did he have? They did not find blood on Mr. Foote. Okay. So you don't run out of time. I think we have your position on that. On the Nepew aspect with Patterson, what evidence is there that Patterson knowingly falsified information? Judge Fisher, he testified that certain footprints were his. And he was at the crime scene and he knew which footprints he did or didn't make. So in order, I mean, I'm not sure beyond that because we haven't had an evidentiary hearing and that's what we've argued we need with this claim. But for a Nepew claim, does the prosecutor have to put that evidence on that should know that it's false, right? Actually, this court in Jackson v. Brown, which was decided after ‑‑ oh, I'm sorry, no, it was decided before the district court's opinion in this case, says that any state's representative, so in this case the lead detective in the case, if he knowingly testified to false information, even if the prosecutor didn't realize that the detective was being ‑‑ was falsifying his testimony regarding these footprints, the crux of this case goes to the credibility of Mr. Henry and whether the jurors believed his testimony over the State's testimony. It seems so that you're setting a very, you know, you're setting a very low standard and practically every ‑‑ it's very rare in cases that the defendant and the detective agree on what exactly happened. So you're just saying because there's a discrepancy, or what if there's a mistake? Is a mistake, does that satisfy Nepew? No, it's got to be knowingly false testimony. In this case, we've alleged that Detective Patterson was presenting false testimony at trial because he knew, he had to have known, he was the person who went out to the crime scene. So he gave that information. It was false. The State has never contested that. They've never come back and said, no, no, that's not accurate. They have just said we can't prove our claim. It hasn't been contested because there hasn't been a hearing on it. Right, but even in their statings. You're saying we have to have a hearing. Correct. But I don't know that it's significant that the State hasn't yet joined issue on that claim since there hasn't been a hearing. But the question is ‑‑ you still haven't addressed my initial question, which is how do you get over the due diligence problem? Again, I ‑‑ Judge Talman, the due diligence goes to the fact that the State was withholding information and presenting false testimony. Let me put it a different way. Why didn't trial counsel ask to see the Mojave County Sheriff's investigative file as part of the pretrial investigation if Mr. Foote ‑‑ or, excuse me, Mr. Henry was so adamant that all the evidence was doctored? He did. He did. And, actually, at the post-conviction hearing where trial counsel testified, he was asked the question, were you able to discover any evidence that the State's photos were withheld from the defense? And he said, I was not able to ascertain that. I subpoenaed everything. I filed motions for discovery for everything. And the people avowed that they had provided me everything. And the case law is clear. If you look at Banks v. Dredke, when the State is avowing that they've turned over everything, that the defendant has a right to rely on that. And it's ‑‑ it shouldn't be up to the defendant to continue to try to find something. Now, in Mr. Henry's case, as you pointed out, Judge Tallman, he continuously complained about this. I mean, it's in the record ad nauseum that he continued to say, this is false testimony. And, unfortunately, Mr. Henry's ‑‑ his complaints had gone unheard. And the judge said, this person's not credible. I'm not going to believe him. And there's findings by Judge Kahn that Mr. Henry is incredible. But now this new evidence changes the entire picture. It's not new in the sense that it didn't exist on the diagram. You're not saying the diagram's new evidence. You're saying that's suppressed, right? Correct. Because that existed before the trial. I mean, it's existed from day one. Did Mr. Foote testify at his trial? Judge Callahan, I actually don't know the answer to that question. I can try to find out. Was the diagram introduced at that trial? Sorry, I don't know the answer to that question either. But I can get back with you on that. That's all right. I just think that, you know, one would be curious as to what he said there. Okay. I have a question because you're working down on your time. On your nexus claim, you're challenging, as I understand it, you're challenging on the trial judge's finding that there was insufficient evidence of alcoholism, and it goes on to state, in any event, there would be no causal connection. If there was insufficient evidence, and that's the primary ground, then why would we ever get to reach the constitutional claim, since there was insufficient evidence in any event? And where have you argued that there was an inadequate finding of fact, an unreasonable finding of fact by the trial judge on that issue? Judge Fischer, we argued in the opening brief that under D-2, that the sufficiency of the evidence finding by the Arizona Supreme Court was unreasonable determination of the facts in light of the entire record. There was uncontested record evidence that Mr. Henry had a substance abuse problem. He was diagnosed with alcohol abuse under the DSM. He had, there were records and reports of him getting DUIs, of being treated in the Why is it unreasonable for the court to have concluded, however, that that was insufficient? Because didn't all that evidence come out of basically, it all was what Henry said about himself, about his alcohol behavior, and then Dr. Fox, I think it was, who interviewed Henry and agreed with him, but he was, again, relying on Mr. Henry's statements, and then there are his criminal history. But why can't the Arizona Supreme Court have concluded that in its judgment that was insufficient? How can we, what's your authority for us to say, well, we can substitute our view as to whether it was insufficient? Well, there's, I have two quick points that I want to make to answer your question. Can I do them all at the time? The first one is that Judge Kahn found Mr. Henry to be incredible, and it was based in part that he kept saying that he was wrongly convicted, that this information was false, that it was being presented against him. We now have evidence to support Mr. Henry's version of the events. And the second one is that there, that a State court cannot ignore facts in the record and not consider key aspects in the record. That's Taylor v. Maddox, this Court's decision. Well, there they absolutely ignored it. Is there any evidence? And they said there was no evidence. Here they said there was insufficient evidence. And that's an, we argue that that's an unreasonable finding in light of the evidence that was uncontested, and it wasn't just based on this. Did you raise this, did you raise that in the district court? That particular argument I'm not sure of, but I. So why isn't that a waiver of the argument? Because you don't waive arguments, you waive claims. Well. And so the legal. This is a factual question as to whether there was evidence in the record. Now we're looking at a new appear. So why shouldn't this have been raised in the district court? Because Mr. Henry raised his claim relating to the causal nexus and the improper analysis, and the district court considered the entire claim, and in part, it considered the sufficiency of the evidence. So that's a valid issue to be raised on appeal. And I'd like to save the last three minutes for rebuttal, please. You may. May it please the Court. I'm Jonathan Bass. I represent the State of Arizona. I'm speaking just briefly about the Tenari claim. That allegation that it was an unreasonable factual finding. Could you bring the mic a little closer? It's hard to hear. Excuse me. The allegation that there was an unreasonable factual finding made in State court is a waived argument. Well, on the alcohol issue, since we're there, I'm not sure that it's a proper characterization that it wasn't considered. But it clearly, it seems that it was considered. It didn't say it didn't have anything to do with anything. It's just the weight that it gave to let's assume that he was more – clearly it was considered in terms of his alcoholic state on the day in question. That was clearly considered. But in terms of his overall alcohol use, was it just said, well, that doesn't have anything to do with anything? Or it was, well, after looking at everything, it just doesn't – I'm considering it, but it doesn't seem to change my view that it affected what he did that day. Well, the Court, Judge Gallagher certainly considered his intoxication at the time of the offense. In fact, he was given a fairly significant statutory mitigating finding on that fact. But as far as his history, his alleged history of alcohol and substance abuse, now he was 40 years old when he committed this crime. So he had many, many years previous. And he – the basis of that evidence or the allegation was essentially his testimony. There was a prior DUI. But essentially, this was Henry telling the Court that he had had a significant problem with alcohol in the past. Henry's not credible. The trial court was plainly within its right to set aside that testimony and to set aside anywhere where that testimony appeared in Dr. Fox's report or anywhere else in the record where you could trace it back to Henry's own self-serving statement. But it was considered – I mean, it was plainly looked at. It simply wasn't found credible. Well, that's not all they said. They said it was insufficient. But then they said even if it were, the – it would provide no additional mitigation without evidence of a causal connection of the crime. Now, under Shad v. Ryan, that's a pretty clear statement of an unconstitutional causal nexus, isn't it? Well, Your Honor, I think you can stop, frankly. I think the statement, at least in the Supreme Court opinion, that it would provide no additional mitigation without evidence of a causal connection, I'm not sure that that could be read, frankly, as a tenured violation. But I don't think you – I think that's dicta in this opinion because I think you could stop. The factual finding is we find insufficient proof of historical substance abuse. This is five Supreme Court justices doing independent review of the record. None of them finding that they're – none of them finding that Henry's allegation of a history of substance abuse is proven in the record. Well, how do we know that that's what they did? They don't say anything. In fact, they say there's insufficient evidence. There's a statement, there's a medical report of Dr. Fox that corroborates whatever its weaknesses may be because it had to depend on Henry's own statements. But there is evidence there. It's not as if there were no evidence whatsoever. We don't know why it was found insufficient. Now we're speculating as to, well, what they might have done. And under Taylor, in our circuit, as counsel said, you can't just ignore evidence. There – it's – the State has a lot going for it in terms of presumption of correctness. But when it doesn't, it just ignores the evidence. And we have no idea why the Court found it insufficient. Well, Justice Fisher, I wouldn't – I wouldn't agree that the Court, the State courts, ignored the evidence. I think they – both at the trial level and at the Supreme Court level, the evidence was considered. It simply wasn't given – well, it wasn't found, frankly. Well, it's – I mean, the argument that I would make if I were in your position is it wasn't that it wasn't considered. It just wasn't given the weight that the defendant wanted it to be. You could look at something and say, well, okay, yeah, but that being said, just because someone's had a prior DUI doesn't mean that they get blackouts. It doesn't mean that, you know, it doesn't mean that they fried their brain using alcohol or – there isn't anything in the record along those lines. And so I guess from that standpoint, you're looking at it ultimately and saying, well, I don't see how it would have changed my mind about how your – whatever you call your alcohol use affecting what happened that day. Yes, you were drunk that day, and I'm considering that. Well, I agree, Judge Gallagher. I mean, the evidence was – was there. Maybe I'm parsing it by saying that it was – that it wasn't found. Well, it wasn't found. It wasn't deemed credible. And if it's not deemed credible, it's not going to be given any weight. But that's not what they said. What they said was there was no causal connection. Well, there's no causal connection because you don't have any. Well, that was the rule of Arizona law, okay? And we've had a lot of cases recently, some of which I was directly involved in, parsing what the Arizona Supreme Court meant. We developed the case of Shad v. Ryan, as you know, and said, absent a clear statement, by the Court, that they were relying on the no causal connection, we will give them all the benefit of the doubt. Well, here you have a pretty clear statement that even if there's no causal connection, no causal connection to the crime. Well, I just – So even if it existed, there's not a causal connection. And that's contrary to Plenard. It doesn't have to have a causal connection. It has to be a factor in the mitigation consideration. You've got statutory mitigation and you've got constitutional mitigation. So it looks like they were considered on the statutory side, but it doesn't look like they were looking at it on the constitutional side. Judge Fischer, I think in the Arizona Supreme Court has, I know in previous cases, in some cases, Arian Williams v. Ryan comes to mind, where the Court made a much clearer statement about its consideration of that kind of evidence and the causal nexus that it required before it would even consider that evidence. And that's arguably a Plenard violation. But here the Court is saying, and I do contend that the statement, the last part of the sentence, is really dicta. It's not the finding they're making, but in any event, this would provide no additional mitigation without evidence of a causal connection. I think what they're saying, I think it can be reasonably read to say that it would provide no weight. I mean, there's just nothing there. Not that we're not going to consider it, not that we need a causal connection even to get into that area, but there is no weight here. And when you're considering weight, a causal connection is permissible. So I think even in that dicta, the Court isn't violating Plenard, but I think the key point is they're not finding it. They're considering it. They're giving Henry every opportunity to present it. They're looking it over. They're not finding any evidence of an historical pattern of alcohol or drug abuse. And so that's contrary to what Fox testified to. He – yes, sir, but that's still – he's still very dependent on Henry's testimony. I mean, he's – and that's the ultimate source. That's the incredible source. And so I think that can be discounted. I mean, the State Court had the right to do that, in my opinion, and certainly there is what the Supreme Court did on independent review. I would like to ask you about Foote's – the notes and the sketch. What does – does the record contain any explanation for why Foote's notes and sketch were not given to Henry until after he filed his Federal habeas? No, Your Honor. I don't – I don't know why this – this particular – these particular pieces of paper were not disclosed at the time. I don't know, and I don't think the record shows, I don't think anybody knows exactly when these were made. I'm not going to stand here and say I know when they were made. They could have been made after Henry's trial. One thing that's interesting to look at, and I know I'm getting into a factual issue here, but – Well, you would be able to know that because if he had a trial and then he entered a plea, and apparently he was unavailable because of his Fifth Amendment rights, after he had a lawyer, someone wouldn't be able to – the detective wouldn't be able to go out and have him make sketches. I mean, I think there's a pretty good – it would seem it's pretty clear that he made them when he was talking to the police. I mean, there's no indication – you don't have any indication that he talked to the police after that night, do you? Well, he was talking to the police apparently up until the time of his trial. I mean, there were apparently times when he was talking to – I don't know exactly what the dates were that he was talking to the police, but there were – there were instances – Well, after he had a lawyer, the police were going out and talking to him? I don't think so. If he was having a jury trial. I'm speculating as to when this was made, Your Honor. I don't know. I can concede for purposes of the argument that it was made before Henry's trial, but I don't – I don't know. I don't – I think ultimately the decision – two things have to be kept in mind when looking at this sketch. One is, you can't separate the sketch from the notes. And if the sketch comes in, the notes come in. And the notes are fairly damning as far as Henry's guilt. So whatever this sketch might show as far as where some tracks were, they have to – it has to be looked at in context with the notes, which – which blame Henry for killing Estes. Would there be a way any of this could come in? I don't think so, Your Honor, because – But you're – are you an appellate lawyer, not a trial lawyer? I'm an appellate lawyer, not a trial lawyer. Okay. Because I'm pretty sure the police went out talking to him after he got arrested and was going to jury trial. No, I see your point, Your Honor, and I'm not – I'm not contradicting that. I – I – So what we're struggling with in terms of trying to say how would a trial lawyer get it in, we're looking at it from – in terms of the significance. She's saying, well, we've got this little piece that it's really important and can get in. And I think, you know, we were asking questions, saying, I don't see how you could get that in with the whole thing coming in, or I don't see how you can authenticate it, or in terms of the rules of evidence. But – I think that's – that's all very valid, Your Honor, and I agree with that. I think that what this – I don't think it would have come in because, as you know, Henry's lawyers tried to get Foote's statements in as statements against penal interest. That was – those statements were excluded. That was upheld in appeal. And I contend that this sketch, to the extent that it can be deciphered, is really just a visual depiction of what Henry's lawyer knew that Foote had already told the police. In other words – and I – what I'll point to is in the – I think it's the Henry 1 opinion by the Arizona Supreme Court. There's a summary of some transcript in discussing the 804B3 evidence. And Foote's being questioned here by Detective Patterson, and Patterson's question is, okay, you helped him all the way there by yourself, meaning Estes and Foote says yes. So Foote had already said, at least in answer to Patterson's question, that he had alone had taken Estes up the hill. Nobody knows whether that's true or not. I mean, Foote has given a variety of statements about what happened. But whatever import this sketch has, it's just a visual depiction, in my opinion, of evidence that has already been deemed inadmissible. There's nothing material here. Could you address Patterson, Detective Patterson? If he, in fact, did shape his testimony, misstate, let's assume that he actually did manufacture evidence. Does Jackson then require us to impute his false testimony to the State? Your Honor, I still think the State, yes. There must be some evidence that the State knew or should have known that Patterson was lying. You're saying yes to his question, but then you're saying the State has to have some evidence, and the answer then would have been no. No, I beg your pardon. I'm confusing. That was dictum on your part. Yes. Let me have that back. I don't think Jackson changes the requirement that there still must be some showing somewhere, some evidence that the State knew or should have known that what Patterson was saying was false. There's no evidence that what Patterson was saying was false at all, but for the sake of argument to make an assumption, there's still got to be more than simply an allegation that Patterson lied simply because his testimony was not, well, was fairly, fairly harmful to Henry. If you want to look at those three claims, we contend they're procedurally defaulted. They're not properly before the Court. They should be looked at carefully individually. There is some overlap in terms of the argument. One thing they do have in common, really, is that they're all three, frankly, attacks on the tracking evidence. And that's really what they are. The bottom line is not all three of them. It's just the tracking evidence. The testimony from Patterson and Lawrence about what the tracks indicate. That's really what this is all about. I think it's just a rehash of what Henry has been challenging from the trial. And now we've labeled them two Brady claims and an Apu claim, but there's, they don't fit the definition of Brady and Apu. Kennedy. Let me come back to what Jackson says. That's why I'm pressing the question. It says, Jackson says, Apu and Giglio make perfectly clear that the constitutional prohibition on the knowing use of perjured testimony applies when any italicized, any of the State's representatives would know the testimony was false. And Patterson was, was Patterson a State representative? Okay. So if, in fact, he gives, if a detective like that and a State's witness gives perjured testimony that he knows is false, you're saying he can get away with it and the person can get a death penalty even if the prosecutor didn't know about it. Well, it's a difficult question to answer, because I think that there's, there's     To make the assumption even that, that Patterson was lying requires. No, I understand. That's what I'm trying to understand, though, because that's what counsel is arguing, relying on Jackson for obvious reasons. So I'm trying, if we get to that point, if we were to conclude that there was enough evidence to show that Patterson had to be lying and knew it, because he knew where he walked, as they say, and therefore he was set out to put Henry away, which is not unheard of. Sometimes law enforcement gets very enthusiastic about its case. And I'm not saying anything about Mr. Patterson making any judgments. I'm just saying it's not an incredible argument to make. Do we, do you read Jackson as insulating the verdict if the prosecutor himself didn't know, even if there was a State representative who knowingly lied? I guess if, to take that question in a very theoretical sense and basing it simply on the statement you're reading me from Jackson, I'd have to say possibly no. But, but. Because say like if you had, this is not, I'm not saying this is the facts here, but hypothetically, say that after the trial it came out that the detective admitted that he did lie in the trial, and so it becomes obvious that as the, but it's also obvious that the prosecutor didn't know about it at the time. So those are your facts. If those were your facts, is the fact the prosecutor clearly did not know that the detective lied, but now we know that the detective lied, is that, does, are you, does, is that, is the prosecutor, can, does that protect the verdict? Because it's clear the prosecutor didn't know. Well, to be frank, I mean, I think if the State or Arizona found out that, that one of the State. Well, right. That's one thing. But he's asking you, what does Jackson say? I don't have Jackson in front of me, Your Honor. And I can only, I can only say that I guess based on, on what you've read to me, Your Honor, I think that, I think that if you have a verdict that's based solely on, well, a verdict that's based in a very material way on perjured testimony by a State's witness, a leading State's witness on a material point, even if the detective was lying at that time, I'd be very troubled by that verdict. But isn't it a Peau violation? I don't think it's a Peau violation. It's hard to say because, I mean, you, I think we need to go a little bit further and find out whether we, what is he lying about? I mean, is he lying about every tract? Is he lying about one tract that he found? It's difficult to take this in a very theoretical sense. If he's lying about it. Well, I understand it would have to, because you qualified it as saying it was material. It would have to be if, right, Your Honor. I'm sorry. But if it were material. If it were material, if, if, if. Sounds like a Nepeu violation. Well, if it turned out that he was lying about every tract or what he was attributing to, really his footprints and so on. Okay. I think we'd have, we'd have some serious problems. I don't think we're going to resolve it here, but. No, it's difficult to discuss in the abstract, but. Okay. But in any event, the, the, but all three of these claims, the two alleged Brady claims and the Nepeu claims, so-called. What about on Henry's counsel, what's your best argument that Henry's counsel's performance was not deficient when he failed to investigate Henry's life history, family background and child sexual abuse? Well, my argument with that is that it's not supported by the facts. The argument is not supported by the facts. He did a investigation to the extent Henry, Henry allowed it. He did a pretty thorough investigation into Henry's past. So Henry wouldn't talk to anyone after Fox, is that correct? Well, it appears that Henry wouldn't talk to, he certainly wouldn't talk to Dr. Leavitt, and that was the psychiatrist whose report was in the PCR proceeding. Well, now Judge Stephen Kahn said that even if Henry's attorney was deficient presenting mitigating evidence, it would not have changed his mind. Are we bound by Judge Kahn's statement? Or I guess another way of putting it would be, can we find prejudice even if the State judge claims that the additional mitigating evidence would not have changed the sentence he gave? Henry? I think you've, I think you've got to give Judge Kahn's findings a very high degree of There was evidence to support it, some reasonable reason to support it, but there's simply nothing in this record. There's the allegation that Henry's lawyer didn't do enough with his mental health evidence, didn't submit enough evidence about it, didn't investigate it. Same with the sexual abuse allegation. And that's where it stops. Well, now, the sexual abuse allegation was before Kahn the first time, correct? Yes, it was. But it just, I mean, essentially it just wasn't, it was there. I see a few references in there that I think at one point it's described as that there was a homosexual relationship with his father when he was 15. At another point, I think that there's some sort of statement that he ties the, you know, something about the killing relative to, it's like my father raping me when I was 12 or something along those lines. So the court knew that he had, that there was some sexual abuse. The first lawyer didn't choose to really emphasize it. He was more on the looking for other factors on the mitigation or, and at some point then later it was talking, they talked about that Foote only got 15 years and so it's not really fair that, you know, that he got the death penalty, that he did have a troubled past, that he was, had been drinking on that evening and all of that. But it never, how important was the sexual abuse in all of this, do you think? I mean, it was known. It was known. It happened when he was 15. He was 40 at the time he committed the crime. He, it was there. It was there. I mean, lawyers make decisions about just exactly what they want to emphasize in these mitigation hearings. The information was there. Henry had a strange relationship with his parents, very hostile toward his mother, prevented her really from participating in helping him develop any mitigation, wanted her cut out completely. It may have been a touchy subject for Henry to get into. I don't know. But his lawyer certainly had it. It was there. It was before Judge Kine. Any consequence of it? Is there any indication in this, like, I mean, sometimes we get factual scenarios in the murder itself that show a sexual sadism or that there's, you know, there could be sodomy. There could be any number of things that are involved or, you know, really. Is there anything in the facts of this particular crime that would, that knowing more about the sexual abuse might shed light on this crime? No, there isn't. This is a crime that didn't have any of those aspects to it. Would that make a difference if it had been, let's say if it had been a crime? I think it might. It might be kind of interesting to see where that might have gone. If there was any evidence really after the incident at 15, if this had been some kind of a recurring problem for Henry or if he had been mentioning it or if it had happened again or something, maybe that would have been worth going into a little bit more. But it doesn't figure prominently, I don't believe, in Dr. Fox's report. It doesn't. Henry had the opportunity to make something of it, I suppose, or when he was talking or had he talked to Dr. Levitt. But you've got two psychiatrists who've analyzed him since that happened. But the analysis is not based on talking to Henry, correct? Well, Dr. Levitt isn't, right. But this incident of sexual abuse, it seems to appear it's there, it's before the court, and it doesn't seem to reoccur later in Henry's life. And so the attorney did his job in presenting it, didn't make it the centerpiece of his mitigation strategy, but at least it was presented. And so without more, I don't think that this Court can find fault with what Judge Gunn did with that IOC plan. And as far as his mental health goes, again, we've talked, but I think that, you know, Henry's refusal to talk to Dr. Levitt is – that was his choice. Well, on two of the issues where COAs were not granted but everyone's talked about it, is there any reason for the Court not to rule on the merits, since we know everything about it at this point, both of them? Well, I suppose on the Tenard claim, I think the record is strong enough there for the State. I think the Court could rule on the merits. I see no reason, frankly, to do so on that claim. I mean, it is so patently not a Tenard claim, in my opinion. The record is so clear that it's a factual finding that you'd be repeating what you essentially said recently in Towery, that these kinds of factual findings don't violate Tenard. So I'm not sure that there's much reason to include that in your claim. But we peeked under the covers of both of the claims that COAs weren't granted on. I mean, essentially, we know everything about them now. I don't think that – Your Honor, if the Court decides to do that, I don't see a problem with that. I'm not sure that they're really necessary. I think the, you know, the certified issues are enough to deal with. But the State wouldn't object, frankly, if you wanted to rule explicitly on the Tenard claim and also on the second claim dealing with the so-called jury experiment. I think the facts in the records of the State – Now, you mentioned the jury evidence. My understanding is that it was 13 years after he was convicted. Yes. And what was presented – were any actual juror affidavits presented, or was it just what the investigators said they said? It was just what the investigators said they said. There was – and to that degree, it did not – it did not comply with Rule 32.5, but the Arizona Rule of Criminal Procedure. The investigator presented in his affidavit a – what looked to be a transcript of sorts of a juror interview. There were some portions of it which appeared to be paraphrased. There were some words in parentheses. But it's not – it's not a true authenticated transcript. So we don't know for sure, based on that, exactly what the jurors said. There is no juror affidavit. Thank you. Thank you. Thank you. If I can just make a few quick points. I only have a few minutes left. Just regarding the Eddings Lockett-Tenard claim, the court didn't talk about weight here. It talked about sufficiency of the evidence, which is a finding specifically under D-2. It didn't talk about weight of the evidence. It said it was insufficient on the record and then said even if it weren't, it could not consider that because there was no causal nexus. The second thing about Foote's notes, we know that they were not made after trial because in his notes on ER 358, he talks about Ken Everett, Mr. Henry's trial counsel, saying that Mr. Everett's trying to get information on me. Mr. Everett would have no need to get information on him if it were after trial. It looked to me like some of the notes may have actually been made while he was in his jail cell. Yeah. And the page numbers, I cross-referenced this, and I apologize that this wasn't in my brief. The page numbers refer to the discovery. And so he's referring to a transcript of a Patterson-Henry interview. But, I mean, it also, there were some general references to I'm not getting adequate care. Right. Right. And then the last two pages of those notes also have suggestion that he would be willing to make up testimony. He says, I don't know about these other crimes, but if the State gave me some more information, I could possibly help them out. So, I mean, there's some issues on the footnotes besides just having some bad things that the judges, Judge Callahan, I think you pointed out there was some inculpatory information. I would strongly urge this Court to uphold or follow Jackson, which says that Patterson is the State. There's no differentiation. And I think that my colleague can. But let's say, even if we give it that interpretation, what do you really have on Patterson at this point except your client disagrees with him and practically every criminal trial in the world, the officer and the defendant disagree? Judge Callahan, it's not just now my client disagreeing. That's what the story was at trial. It was my client's testimony against Patterson's. Now we have the State's own tracking expert who now is saying this footprint couldn't have been Patterson's. It's not consistent with his boot print. We have another expert saying, no, these aren't Patterson's footprints. So we now have evidence. How can we consider that under Penholster? I thought you conceded that in our supplemental briefing. Under Penholster? Penholster doesn't apply because the Brady-Napoo claim has never been presented in State court. There's never been an adjudication on the merits in State court, which is what I suggested in our letter brief that you asked us to write, is that this case needs to go back to State court for an evidentiary hearing under cassette. I see my time is up. I didn't get to mention the juror issue, but that, again, is another major issue because the jury was testing Mr. Henry's credibility. But it wasn't – it's Henry's burden to present it in a form that comports with PCR proceedings, and there's a real – I hate to keep hammering away on evidentiary issues, but it wasn't presented in an admissible form, and the burden is on him to do that in order to warrant a hearing. He presented a transcript of a juror interview with an affidavit supporting it from the investigator. There's no rule under Rule 32. It does say that Rule 32 petitions are supposed to be supported by affidavits and declarations. There's nothing that the State court shouldn't have discounted that evidence. Even though it was 13 years later, that was one of the reasons cited. Part of the reason why it was many years later, in part, was Mr. Henry was trying to get these jurors interviewed. He even asked the Arizona Supreme Court to stay his direct appeal so that he could get these jurors interviewed. His counsel wouldn't do it, but then he had a direct appeal that remanded his case for resentencing. So part of the reason why it was many years later wasn't due to Mr. Henry's fault. It was due to the fault – the fact that his death sentence originally was unconstitutional and the State court sent him back for resentencing. But that goes – that doesn't go to the penalty. It also goes to the guilt phase of the trial. Right. But he was still in proceedings that he was trying to litigate this issue and have the jurors interviewed, and he asked – it's cited in the brief, the different places where he asked to have jurors interviewed, and they – it didn't happen until his second PCR proceedings after his resentencing. In this case, I strongly urge this Court to reverse the district court's order and allow Mr. Henry to have a hearing because this conviction cannot stand. Thank you. Thank you very much, counsel. We appreciate the argument today. We will be in recess. Case is submitted.
judges: Fisher, Tallman, Callahan